LEWIS BOND *v.* SAMUEL B. FROST AND OWNERS OF THE STEAMBOAT CONCORDIA.

In an action against a common carrier for damages to goods, the proof must be clear and certain, to relieve him from liability, that the damages did not arise while the goods were in his hands; for the presumption is against him, not only from the terms of the bill of lading, but from the policy of law. In suits against common carriers the testimony in their behalf of their clerks and servants, must be received with great caution.

APPEAL from the Fifth District Court of New Orleans, *Buchanan,* J. *Hamner,* for plaintiff. *Bonford,* for defendants and appellants.
38

CAMPBELL, J.   This suit was instituted for the recovery of damages, alleged to have been sustained by plaintiff on a shipment of ninety bales of cotton.

The steamer *Naomi* received the cotton in Hatchee river, and stipulated, in a clear bill of lading, to deliver it to the consignees, *Felix Walker & Co.*, in New Orleans, "they paying freight at two dollars per bale and charges, with privilege of re-shipping."   On the 14th March, 1850, this cotton was re-shipped at Memphis, by the *Naomi*, on the steamer *Concordia*.   She undertook, by her bill of lading, (in which it was expressed that the cotton was in good order and condition,) to deliver it at the port of New Orleans, in like good order and condition, upon consignees paying freight at the rate of one dollar per bale, and charges, amounting to $106 87.

Upon the arrival of the cotton at the port of New Orleans, it was ascertained that fifty bales were damaged.   The consignees received the cotton, except five bales, which the carrier retained and subsequently sold, without the consent of the owner, to reimburse the freight and charges, the consignee having refused to pay them, in consequence of the damage done to the cotton.

The plaintiff's claim for damages is based upon the non-delivery of five bales of cotton, expenses incurred in picking and preparing for market the fifty damaged bales, loss of cotton in picking, etc., as set forth in a statement annexed to his petition.

On the first trial of this cause, in February, 1851, before the Fifth District Court, judgment was rendered in favor of the plaintiff for three hundred and seventy-three dollars and fifty-nine cents.   From this judgment the defendant appealed.   After a careful examination of the facts disclosed by the record, the Supreme Court, in effect, held that even though it be admitted that the recital in the bill of lading is not conclusive against the vessel, and that the carrier may be permitted to go behind it, and prove that the condition of the cotton, at the time of its receipt, was different from what is recited in the bill of lading, yet that the policy of law, a policy—as was well said—justified by long experience, not only throws the burden of proof upon the carrier, but holds him to a strict accountability, and will not permit him either to qualify or evade the effect of his written acknowledgment in the bill of lading, except upon evidence the most clear and convincing; in the correctness of which opinion we fully concur.

Being of opinion, however, that there was not sufficient evidence to establish the correctness of the charge of two hundred and five dollars and fifty-six cents, for loss of weight in picking fifty bales damaged cotton—there being no proof of the value of the cotton picked out, or that it was necessarily taken out as damaged cotton—the judgment of the District Court was reversed, and the case remanded for a new trial.   6 An., 803.

On the second trial, a number of the most intelligent merchants of the city were examined, who stated that it is the uniform usage among the cotton factors of the city, when cotton consigned to them is so much damaged that it will not "*dry out,*" to send it to the pickeries, that the damaged cotton may be removed, and the rest repacked.   They further state that it is the uniform usage for the picker to retain as part of the price the damaged cotton; and, though in the opinion of some of them, this mode of remuneration is objectionable, they regard it as the only feasible plan that can be adopted.

The custom is universally recognized, and the defendants, knowing as they must have done, that in accordance with established usage, the cotton would be

sent to the pickery, if they knew a better mode of rendering it merchantable, should have pointed it out.

In reference to the amount charged for picking and re-baling the damaged cotton, we concur in the opinion arrived at by the District Judge, who says:

"Various witnesses, conversant with the cotton trade in this city, have been examined as to what is a reasonable charge for taking to pieces, airing and re-baling cotton, partially damaged, in bales. They concur in stating that the price charged in this instance, (one dollar per bale,) is below the usual price. *Mr. Hill,* an eminent merchant of long standing and experience in the cotton trade in this city, declares, that he has constantly paid $1 50 per bale, allowing the pickers to keep the damaged cotton; that if he required the picker to account for the damaged cotton, he would consider it reasonable to allow at *least* double, or $3 per bale, for his services. In the present case, the damaged cotton retained by the picker was thirty-four pounds per bale. The cotton was shipped afterwards to Liverpool, and invoiced at six cents per pound. At that rate, the damaged cotton yielded the picker two dollars and four cents per bale, or one hundred and two dollars for the fifty bales, picked, dried and re-baled. The charge made by the picker was one dollar, with the privilege of retaining the damaged cotton. But by making him account for its proceeds, we find, as above, that this cotton has yielded him three dollars and four cents per bale. This only exceeds, by two dollars, for the whole fifty bales, what *Mr. Hill* calls a minimum price for picking and rebaling. The further light thrown upon the case by the additional evidence, only will justify, if any, a reduction of two dollars on plaintiff's claim."

The doubt expressed by the Court in remanding the case for a new trial, resulting from the want of proof of the value of the pickings, and of the necessity of taking such a number of pounds from the bales, is resolved by the exhibition of the invoice of the damaged cotton, and the testimony of *Mr. Hill,* from which it appears that the cotton was worth six cents per pound to the picker, and that thirty-four pounds (the weight lost per bale by picking,) is a small average for cotton that is damaged enough to be picked.

After a careful examination of all the testimony adduced, we are of opinion that the defendants have failed to establish, with sufficient certainty, that the damage to the cotton complained of, (and which is fully proved,) was sustained before the cotton was received on board the *Concordia.* They may have created a doubt on this subject; perhaps rendered it probable; but have by no means made it certain; and we deem this certainty of proof necessary to rebut the presumptions of law against the carrier, presumptions which arise, not from the terms of the bill of lading alone, but from the policy of law.

This rule may doubtless, in some instances, operate with severity, but, as was said by *Chief Justice Holt,* in a case somewhat analagous, "This is a politic establishment, contrived by the policy of the law for the safety of all persons, the necessity of whose affairs oblige them to trust those sort of persons, that they may be safe in their ways of dealing."

The Supreme Court, as has been shown, concurred in that portion of the judgment of the lower Court which recognized the liability of the defendants for the damage to the cotton. On the new trial, however, the whole case being again open, additional evidence was introduced. The witnesses of plaintiff, all of whom appear to be familiar with the cotton business, being either factors,

BOND
*v.*
FROST ET AL.

cotton brokers, or pickers, concur generally in the opinion that the damage was recent.

The only additional testimony offered by the defendants to prove that the damage did not happen on the *Concordia*, is found in the depositions of *Joseph D. Phelps* and *Samuel David*, both servants of the owners of the *Concordia*, the one being a clerk, the other mate. They give it as their opinion that the damage was an old one, and could not, therefore, have occurred on the *Con cordia*.

Without intending to disregard the testimony of these witnesses, on the ground of their being servants of the defendants—for we give to their testimony all the consideration which can properly be claimed for it—we deem it proper to state that we receive it with the allowance implied by the opinion of *Best,* C. J., in the case of *Riley* v. *Horn,* 5 Bing., 217, (15 Com. Law R., 423,) in which he states that " When goods are delivered to a carrier, they are usually no longer under the eye of the owner ; he seldom follows or sends a servant with them to the place of destination. If they should be ,lost, or injured by the grossest negligence of the carrier or his servants, or stolen by them, or by thieves in collusion with them, the owner would be unable to prove either of these causes of loss ; his witnesses must be the carrier's servants, and they, knowing that they could not be contradicted, would excuse their masters and themselves."

We think proper to add that, as the care of the cotton on board the *Concordia* was distinctly at issue on the former trial, it is an unsatisfactory circumstance that the evidence as to the particular place where the cotton was stowed was not brought forward until the second trial.

The defendants having failed to establish satisfactorily that the cotton was damaged when received on board the *Concordia,* the judgment of the District Court is affirmed, with costs.